All right. In this matter, before we start the clocks running, I want to exercise a little bit of my judicial bossiness in terms of since we've got an appeal and a cross-appeal here, we've discussed this as a panel, and I want to propose how you each get 20 minutes total, but that makes it a little bit dicier in terms of when you both, you know, since you're responding, you each have an appeal and you're responding. And so what I'm, what we're requesting is that Lozano goes first, and with your 20 minutes total, you know, although I can't tell you, you know, how to, are you Lozano's side? Okay. All right. Since I don't know either of you, then I'm sorry. But I can't tell you exactly, you just get 20 minutes total unless we want to ask you more questions. I think experienced lawyers know that the 20 minutes is really our time, even though we're not going to be talking about it, even though we tell you that it's yours from the, and this is a complicated case. So, but that what I might suggest is if you use 10 minutes talking on your part of the appeal, and then after AT&T speaks, that when you come back, whatever time you have left, you're going to need to respond to the cross-appeal, but that's then also your rebuttal. All right? So that will be your 20 minutes. First, you will talk about, you've got, well, you've got response to their appeal, plus you have your appeal, and then you have rebuttal time on your appeal. So the, I guess from the standpoint that how you want to do your time, you're going to have the last word, because they're going to do, I know this is, they'll do their appeal, and then when they come, then after you've spoken, they're going to come back and they'll do response to the cross-appeal, plus their rebuttal. So you'll have the last word will be yours, but the last word that you're speaking on is going to be on your rebuttal time. So if that, if you're not more confused after that goes, the best is Mr. Lozano's side starts. Thank you very much, and good morning. My name is Jay Paul Janak, and I represent Mr. Lozano, who's the plaintiff in the district court below, and the appellate here today. I guess I'm going to be spending 10 minutes and then reserving 10 minutes. Well, you can, I mean, you could use all 20, but then you won't have any time left. All right. So that's the, you have 20 minutes total. So you decide if, would you like me to alert you when it's 10 minutes, if you're starting to go past that? I would appreciate that. Thank you. I'd like to start today by discussing the primary point in our appeal, which is why the district court erred in our view in failing to certify a nationwide class on the FCA claim and the Declaratory Judgment Act claim. And that we believe the district court was wrong on both counts. First of all, in the AT&T Corporation versus Coeur d'Alene decision, the Ninth Circuit, as this Court is aware, held that Section 207 of the FCA established concurrent jurisdiction in the FCC and the district courts in those forms alone. No tribal courts, no state courts. We believe that that was binding Ninth Circuit precedent on how to resolve the issue as to whether or not an FCA claim can be subject to arbitration. Obviously, that did not satisfy the district court below. The district court relied on a couple of other district court decisions, one out of the district court in Florida, which is the Penberthy case, the other case being the USF telephone billing practices case out of the district court of Kansas. In fact, both of those cases were not subject to arbitration by trial. And neither case actually dealt with the issue that was before the Ninth Circuit and the Coeur d'Alene tribe case. So that's reason number one. Reason number two is the district court did seem to recognize in its opinion that where Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue, then arbitration can be accepted or left out of the process. And the court cited to the Mitsubishi Motors case, a U.S. Supreme Court case. But really there are three, there's a trilogy of Supreme Court cases that deal with this issue. One is the Mitsubishi Motors case, another is the Greentree v. Randolph case, and the third is the Gilmer v. Interstate Johnson case. And those three cases, if read together, say that an intention to evince or preclude a waiver of judicial remedy may be evinced by the text of the statute, the legislative history, or an inherent conflict between arbitration and the statute's underlying purpose. I believe we have all three here. I've already addressed the text of the statute and how that's been interpreted by the Ninth Circuit and Coeur d'Alene. In terms of the legislative history, the legislative history of the FCA, which is embodied in the 1996 House Representative Conference reports, indicates that the FCA was intended as a pro-competitive statute and a statute to be protective of consumer rights. And most importantly, a statute designed to establish a universal body of federal law to guide long-distance carriers who provide services throughout the country. This explains why Congress limited the forms in which an FCA claim can be brought to the FCC and the district courts, because only then can you have uniformity in law. If you open it up to the state courts or the tribal courts or any other forum, then you lose uniformity. You risk conflicting decisions in various states across the country that can never be reconciled, because, as we know, there's no all-states court in this country for reconciling different state court decisions. The same is true with respect to arbitration, but it's even worse. You have people who are not judges, sometimes not even lawyers, who are deciding FCA issues if FCA claims can go to arbitration. Counsel, in the tangled procedural history that this case involves, where have you raised the question of arbitration previously? Well, there was a motion to compel arbitration at the outset of the case, if that's what Your Honor is referring to. And what was the result of that? Well, the result was that initially the district court compelled arbitration. We then filed a writ petition with the Ninth Circuit. The Ninth Circuit sent it back to Judge Ray and instructed him to consider his decision in light of the recent decision, then-recent decision in the Ting case. Judge Ray then entertained our motion to vacate his previous order compelling arbitration, and he in fact vacated that order compelling arbitration. Thereafter, the defendants took an appeal of the arbitration ruling. The arbitration ruling was brief. It was argued. It was pending for over a year, I believe, and it was finally dismissed by the defendants. So that's the other context in which the arbitration issue was raised. And unfortunately, we never got a decision from the Ninth Circuit. So to that extent, the decision by the district court below is what governs. In other words, this arbitration provision is unconscionable. Isn't that decision based on what Ting provides? The district court's decision? Yes. Yes. The district court vacated its previous ruling after considering the Ting ruling, correct? So you won. Yes, we did win. Very well. I was saying that the same applies with respect to arbitration, because you have no uniform in decisions. You have arbitrators who are going to making rulings, which are subject to review by courts, but only under circumstances where there is fraud or other wrongdoing. And so what you end up with, if FCA claims can go to arbitration, is the exact opposite of what Congress and the FCA envisioned in terms of uniform law. You have arbitration, which relies upon state law, which is going to be different in all 50 states, potentially. Potential conflicts of law. Again, it's the absolute opposite of uniformity. Let me ask you this. All right. So you pointed out what you think the errors were in the district court failing to certify Lozano's claim under the FCA. And we'll look at that. But let's assume we don't agree with you on that. Do you disagree with the district court's conclusion that, and I don't know whether we do or we don't. I'm just going to the part of it. Do you disagree with the district court's conclusion that a cause of action under the Declaratory Judgment Act is parasitic on an FCA claim? I don't think it is per se, but I think in this case, the way we have pled it, that it is, quote, unquote, parasitic on the FCA. So you have to win on the FCA? No, I don't think so, because I think there's a different standard that applies to the declaratory relief claim. That claim as a separate claim for relief can be certified as a B-2 claim because it seeks declaratory relief as opposed to damages. And because under 23C-4, that allows the district court to certify causes of action which otherwise meet the elements of 23A under either B-3, C-4, or otherwise. In other words, if you have a situation where the district court says, all I have here that I think I can certify is a declaratory relief claim, under C-4, the district court can certify that claim as a B-2 claim, notwithstanding B-3, because B-3 obviously doesn't apply. So even if you conclude that the district court was right, and if you conclude that the FCA claim should not be certified, I think there's still room, and I think, in fact, the declaratory relief claim should be certified as a B-2 claim. I have a couple of questions on Meyer for you, but do you want to wait until after they talk? I would prefer to, Your Honor, if that's acceptable. Interestingly, just in terms of talking about what I believe is a compelling issue, the fact that you can't have uniformity in law as intended by the FCA if you're going to have FCA claims decided in arbitration, if you take a look at the Universal Services Fund case, even though that district court was talking in the context of de-tariffing, the district court made many of the same points that I make here today, and I would direct the judges to pages 1119 and 1120 of that opinion, where the district court says, The congressional objective of achieving uniformity in rates, terms, and conditions of service remains in full force, notwithstanding de-tariffing. Applying the laws of all 50 states to defendants' FCA claims would impede the congressional objective of achieving this uniformity. The lack of uniformity in the laws of all 50 states will, in fact, ultimately lead to a de-tariff. It will ultimately impede the congressional objective of uniformity. That's exactly the same situation that we have here with regard to the issue of whether or not, under the FCA, claims can be sent off to arbitration. Kennedy. Under what standard do you review the Court's decision that the denial was based on a predominance of individual issues? Zellner. Well, the standard for review on a class certification motion in general is one of abuse of discretion. However, here, where the Court is making a finding and a conclusion of law under the FCA, I believe that type of determination has to be reviewed de novo by this Court. Kennedy. Predominance of individual issues, then, to you, is a question of law? Zellner. Predominance of individual issues is a question of fact, I suppose. You know, the judge has to do a weighing process. Kennedy. And then we're in an abuse of discretion review? Zellner. Abuse of discretion review with respect to his finding as to whether or not there was predominance. With respect to decisions that he makes that underlie that finding of predominance, for example, with respect to the Court of Lame Decision and whether or not that applies, which is purely a question of law, that's an issue that I think this Court has to review de novo. That's my analysis. I wanted to, and I know I'm past my ten minutes, but I wanted to continue for a couple more minutes on this issue. Zellner. Sure time. Kennedy. The other point I wanted to make is that the District Court concluded that, and one of the factors in the District Court's decision was, the District Court said that almost certainly the defendants would move to compel arbitration if, in fact, the class was certified. And the District Court made that decision because the District Court said, well, they said they're going to do so, and they've done so previously in the case. First of all, they had not done so previously in the case with respect to the FCA claim, because at the time that the motion to compel arbitration took place, at the outset of the case, there was no FCA claim that had been pled. But more importantly, I think the speculation on the part of the Court as to whether or not the defendants would actually move to compel arbitration in all 50 states was simply speculation on the Court's part, and I think it involves a merits determination that needs to weigh post-class certification. For example, some of the things the District Court failed to consider is post-class certification. Would the defendants actually move to compel individual arbitrations of, say, 100,000 class members in Colorado or 250,000 class members in Texas? Is that really what the defendants would want to do, hundreds of thousands of individual arbitrations? Of course not. The whole purpose of the arbitration provisions and the class action waivers that the defendants put in these contracts is to attempt to ensure that they have as many or as few individual arbitrations as possible. So for the Court to suggest that the defendants likely would move for arbitration in all 50 states, post-class certification, I think is pure guesswork on the Court's part. There are other considerations. The law in some of the states might be such that if the class action waiver is determined to be unconscionable, it should be severed, in which case the arbitration goes forward on a class-wide basis. In those states, you can be very sure that the defendants are not going to be moving to compel arbitration because defendants always admit that their worst nightmare is a class-wide arbitration where they have no right to appeal. Other considerations, the fact that the law has changed a lot since 2002 when we were dealing with the initial motion to compel arbitration. Back then, there was no team decision after our first round. There was no disargument. Would you argue in favor of remanding to the district court? On this particular issue? Possibly. I think there's two things that this panel can do. One, this panel can recognize that Judge Ray erred in failing to certify a national class based on the FCA issue, and that's the only issue that Judge Ray pointed out as precluding class certification. He found that the class should be certified under 23A and otherwise under B-3. So I think this court can simply say the district court was wrong and the FCA claim and the parasitic declaratory relief claim can be and should be certified. Alternatively, this court can remand it down to the district court with instructions on how to do it. There are instructions that the district court should do that or at a minimum that the district court should look at something that Judge Ray failed to look at, and that is whether or not the FCA claim at a minimum and the declaratory relief claim should be certified on behalf of the California class. Because when you're dealing with just the California class, the only issues that Judge Ray had with respect to national class certification are gone. There are no more issues with respect to arbitration laws of the FCA. It has to be sent down to the district court for the district court to look at that issue, something that was not done in this case. I think with that, unless the panel has questions for me, I'll reserve my remaining five minutes or so. Thank you. Good morning. I'm Jim Grant on behalf of the defendant, AT&T Wireless, and I guess I'm a little confused about my time at this point. What I think I had intended to do was to start with the court's order of May 31 and to address the California's for disability rights and Meyer case. I think I'll begin by responding briefly. Well, you need to respond to their appeal and you need to state your case in chief and then save whatever time you want. You know, to come back after they respond to your appeal for your rebuttal. I think I understand. So I'm going to start off with a brief response to Mr. Gignac's comments, relatively brief, and then move right into our appeal because I think that's the thrust, honestly, of the issues that are before the court today. The appeal that plaintiff has raised here is the denial of the nationwide class on behalf of the plaintiff regarding the Federal Communications Act claim. The only argument they've raised there is that Federal Communications Act claims allegedly are not arbitrable under the Federal Act. They latch on to a single sentence in the Coeur d'Alene Tribe's decision of this court, which talked about whether a claim could be submitted to a forum in an Indian court, a Native American court. It had nothing to do with arbitration. The Coeur d'Alene decision says nothing about arbitration. There's a strong Federal presumption in favor of arbitration embodied in the Federal Arbitration Act. Because of that, the U.S. Supreme Court has recognized in Gilmer and Mitsubishi and other cases that only in those circumstances where Congress has advanced a very clear intent that claims not be arbitrable in Federal claims, those are the only situations where those such claims are not arbitrable. There is no such expression of intent regarding the Federal Communications Act. About all that Mr. Gignac has offered to you is a preference that they would like to arbitrate claims. They would like to have a national result as opposed to a statewide result. But in the analogous context of antitrust claims and the analogous context of copyright claims, both of which also are exclusively Federal judicial jurisdiction, the Court has held, the U.S. Supreme Court has clearly held that those claims are arbitrable. The only decisions that have been decided thus far about whether Federal Communications Act claims are arbitrable have also decided that they are arbitrable. On this point, Judge Ray was correct. There are a variety of different results that would obtain in the 50 states about arbitration of Federal Communications Act claims. Because of that disparity of law in all those other states, a nationwide class makes no sense here. If I may, let me turn to our Appeal in Chief. And as I said, I wanted to start with the May 31st order from this Court, which pointed to two cases, Californians for Disability Rights and Mayer v. Prince Spectrum, L.T. Both of those cases concern standing. Both of those cases underscore and support the arguments that we've been urging to the Court, that Mr. Lozano has no standing neither to pursue his claim about out-of-cycle billing nor to pursue a claim concerning the arbitration clause theory, which was the claim that the District Court certified even though it never updated. Thank you, Ms. Stewart. Do we need to remand for the District Court to consider Mayer, or do you think that Mayer is dispositive of your issues? I don't think you need to remand to have the District Court reconsider. Tell me why. There's a decision in this Court, Weirbo v. State Farm Mutual, an auto insurance company, where this situation came up. In the interim, while an appeal was pending, the named plaintiff, who apparently had standing originally, lost that standing because of an intervening decision of the Montana Supreme Court. This Court said the proper remedy in that circumstance is outright dismissal, and we must remand to the District Court to dismiss the case with prejudice. That, I believe, is the right result here as well. Mayer is clear on its face, and I'll move to Mayer first. Mayer is the situation of seeking to challenge an arbitration clause where that arbitration clause has not been enforced against anyone. That's our situation. Mr. Lozano here brought his claims. We did move to compel arbitration, but the arbitration clause ultimately was not enforced as to Mr. Lozano. It is not enforced as to any class member here. So we not only have a named plaintiff who has no injury himself, we also have the balance of the class who also have no injury. This all falls under Prop 64, where there's the two-pronged standard that Mayer tackles. Counsel, stop for a moment. How can you say he... I mean, you use the phrase injury. I'm going to use the phrase damages. He has damages. I mean, the District Court found that. You don't bother to mention it in your briefing, but the District Court found there are damages. And furthermore, found that your client's effort to pick off people who were complaining by suddenly deciding to pick off a plaintiff is not a subject of this reference in your briefing. It seems to me that that's completely fatal to your entire argument in this area. I need to clarify two points. And unfortunately, they've been very confused in the record. First, to the point that Judge Robert, you just made, the District Court was confused about picking off plaintiffs. The facts are, and these are undisputed in the record, that when Mr. Lozano first signed up for service, he did have a charge on his bill that was an out-of-cycle charge. He did not have a charge on his bill that was an out-of-cycle charge. He called up AT&T Wireless. Nobody's filed a suit now. Nobody's threatened a suit. Mr. Lozano called AT&T Wireless. They said, they explained to him what out-of-cycle billing was, which he should have known from the disclosures in his contract. But then they decided, we're going to take it off your bill. They said, we'll resolve that problem. Mr. Lozano accepted that. There was never a credit given back. Nobody picked off a plaintiff. This didn't occur after the lawsuit was filed. This all occurred before there was any lawsuit at all. Mr. Weber pointed out this analogy to me this morning. It's sort of like, I check out of my hotel, and I go to get my bill, and the people at the front desk say, oh, there's $10 of charges for the minibar. And I say, I didn't use the minibar. And then they say, that's fine. We'll take those charges off your bill. That's Mr. Lozano's situation. So at the time that he filed suit, Mr. Lozano had incurred no out-of-cycle charges, had paid no out-of-cycle charges, had lost no money, had lost no property. Now, I have to apologize for one other thing, too, because there's standing issues here that relate to the out-of-cycle building charges, which I was just addressing, Your Honor. And then there's standing issues here that relate to the arbitration clause theory. When I was talking about Meyer and McAllister. Let's stop for a second. It seems to me what the court said is that AT&T's effort to avoid suit was to either not charge or to reverse the suit. That's what appears to happen to Mr. Lozano. Is he, in your phrase, he contacts AT&T. And the court makes a finding that it's not going to follow that effort or to acknowledge that effort because to do so would be basically to encourage efforts to avoid suits by picking off potential class representatives. How do we review that finding by the district court? I'm a little perplexed because, first of all, I'm certain that's not a finding of the district court, Your Honor. That's plaintiff's argument. And they've argued that excessively. But the district court's only finding here was that Mr. Lozano received a credit after he filed suit. And we've cited that in the record. And, in fact, that's wrong. It's plainly wrong. Plaintiffs haven't pointed to any record evidence to the contrary. And there is no record evidence of any sort of pattern of picking off any class representative or any one related to a suit. I'm afraid that's simply plaintiff's argument. The district court's finding is a very short finding. And it is one reference to the fact that he thought he got paid after suit. That's not true. In fact, what happened here is we have a situation instead where Mr. Lozano gets a full resolution of his claim. And then he turns around and files suit, even though that's already been resolved. And this is... Let me ask you about whether he was on the one rate or not. What is in the record about that? That's also very clear in the record, Your Honor. And it's another of the points of the confusion. Mr. Lozano's testimony at trial, and I can get you the record cite board if you like. I have that. I just want to sort of get that. As we're talking on all these issues, I think that that is important relative to some of the  Okay. I just said testimony at trial. I meant testimony in deposition. Mr. Lozano testified and admitted in deposition that when he first signed up for service in September 2001, he signed up for the digital advantage plan. He did not sign up for the digital one rate plan. These are different rate plans, you know, $39.99 versus $59.99, nationwide roaming versus roaming only in limited areas. And he admitted as much. This case is premised on, and the claim that the plaintiffs have asserted here, is premised on the advertising for digital one rate. Now, this is a little bit of history, but digital one rate was the first plan to eliminate roaming charges and long distance charges throughout the country. It made a call anywhere the same price. And so the advertising claims for it were, with rates this low, a wireless phone is like your only phone, and no surprises. The plaintiff's theory was that those kinds of tag lines, those kinds of advertising statements about AT&T digital one rate, somehow deceived a plaintiff who was buying digital advantage, about which no similar statements were ever made, into believing that there could be no out of cycle billing. So he becomes the one rate customer later? Yeah, he becomes a one rate customer about a year later, six months later, after he's filed the lawsuit, and after he's continued on AT&T wireless service. In fact, he stays on AT&T wireless service for more than three years. And during that time, he switches to digital one rate, and he also adds another line of service, so he's actually expanding his service, and he renews his account, and in the end, he ends up coming out ahead because of out of cycle billing. The way it works out for him is, he comes out ahead, because this happens very rarely, and it easily can work to a subscriber's advantage or disadvantage. In his case, it worked to his advantage. He came out about $50 ahead because of the way he was charged, as opposed to if he had been charged the way he says he should have been. So we lack standing here in a variety of different ways, and this is California for Disability Rights first. We lack standing under Prop 64, which was intended to eliminate the kind of claim where there was a plaintiff that didn't have an injury, in fact, who was injured, who hadn't seen the advertising of the defendant. It's exactly what the intent was stated in California for Disability Rights and in the proposition itself. So Mr. Lozano has no standing on that ground. Mr. Lozano has no standing because ultimately, he benefited from the practice, as opposed to being harmed by the practice. And then when we turn to the Arbitration Clause claim itself, Mr. Lozano has no standing because the Arbitration Clause was never enforced against him, and in fact, was never enforced against him. And it was never enforced against anyone. So I think as to both California for Disability Rights and as to Meyer v. Sprint Spectrum, what they established is what we've been saying all along. Mr. Lozano here lacks the standing to pursue a claim. Sorry, Your Honor. Didn't the court find that there was damage based on the fact that he needed to reserve some portion of his minutes, and therefore, that he did not get the use of the full allocated time that he thought he had every month? The court talked about this theory of a reservation injury. And to be honest, I'm not sure that there's anything in the record that Mr. Lozano ever did this actually, ever did reserve the injury. But what's really important here, there's a couple things. One, this reservation injury is not something that he supposedly did before he filed suit. This is something he did after he learned about outside cycle billing and after he filed suit. So we have a claim here where Mr. Lozano is asserting a claim about deception. Supposedly, people bought AT&T service based on the deception of an advertising plan and didn't know about out of cycle billing. But that's not what Mr. Lozano's claim here is. Mr. Lozano's claim and what happened to him was that he says he started doing this reservation after he fully knew about out of cycle billing. Well, that's not a deception claim at all. That's a completely different notion. But beyond that, so first of all, that also destroys Mr. Lozano's typicality. He's trying to represent these people who supposedly were deceived. But beyond that, it also... That's a difficult problem. The class here is defined as anyone who experienced out of cycle billing for a four year period of time. So it's basically anybody on a one rate type plan, whatever that means. But that actually goes to another point as well. Because the problem is, if you have this reservation idea, this reservation injury, then it's different for every single subscriber what they did or did they care. Maybe some subscribers reserve minutes once they learned about out of cycle billing. Maybe others don't. In fact, probably most don't. Maybe some care about this. Maybe many don't. And for that matter, for any given subscriber, even Mr. Lozano, assuming he did this, does he reserve minutes every month? Does he reserve minutes some months but not other months? The point is, you're going to go into an individualized inquiry for every single subscriber about what this sort of reservation injury was. And if there's any commonality in this case, it's destroyed by the time we get to that. Well, hypothetically, if you accept the premise that the definition is inappropriate because it's too broad, isn't the district court in a better position to reassess that than us trying to determine a bunch of facts that aren't really before us? With all due respect that you've represented, this must be the case. I mean, that's simply not in the record. We don't know. In fairness, Your Honor is right that the district court is in a better position ordinarily to assess factual issues relating to class certification. But what we have here is a situation where it's clear on the record that the district court made factual errors, and we've pointed out those factual errors. This is a clear-cut case of clearly erroneous. So those errors, once they're understood, end up showing that Mr. Lozano doesn't have standing and isn't typical at all. We could argue among us about commonality and whether that by itself was so much wrong in this case with no standing or threshold issue, no typicality, attempting to represent a class of people who saw different advertising. And, as you pointed out as well, Mr. Lozano himself admits he never saw any advertising, never relied on advertising, so his claims are atypical in that regard as well. I need to ask you about the unfairness claim. I think I'm inclined to think if you properly pled an unfairness claim on the inadequacy of the disclosures, that the four factors would favor certification. But I don't, it's very vague to me what, and I'm going to ask the appellant on this, but what exactly, you know, what, you know, on the one hand, it sort of looks like that the district court may have tied the unfairness to the breach of contract, or which, you know, I can't tell what it is. What's the unfairness? What is, what do you think that the unfairness claim is? I struggle a little bit with what unfairness claim the district court accepted as well, but what we do know is this. There was only one claim, one theory the court accepted, and that was this notion that subscribers were unaware of out-of-cycle billing, even though there's an express disclosure in the contract about it, because they were deceived by this advertising for AT&T digital one rate. That's the unfairness claim. It's the only claim in the case. To the extent that plaintiffs were trying to assert an unfairness claim challenging the practice of out-of-cycle billing all by itself, just saying that is an unfair practice, we know that that was precluded. You can't make that claim, because under Section 332 of the Federal Communications Act, you cannot challenge rates charged, and in fact, there's a decision saying out-of-cycle billing is a component and is a rate charge. So because of that, plaintiffs in the trial court skirted around that and said, this is a disclosure case. We're not challenging the practice. Instead, we're challenging the disclosures. So the unfairness claim, though it's labeled in that way, Your Honor, is actually a claim about the disclosures for out-of-cycle billing, and that's the only claim that the trial court accepted, and it's really the only claim we have before us today. I'm short of time. Can I reserve? Thank you. First off, let me answer your question with respect to how the unfairness claim is pled. And in Paragraph 7, it says, Paragraph 65 of the Second Amendment Complaint, it says that the practice of defendants, which is referring to out-of-cycle billing, is unfair because it is not fully and adequately disclosed at the time that the customers of AT&T Wireless contract to obtain their service. So it's clearly a disclosure claim, an inadequacy of disclosure. And it's important to understand that when Judge Wray was doing his class certification rule, he distinguished between plaintiffs' two different theories with regard to claims. And the first one is that he identified claims that he referred to as deception claims, whether or not the disclosures and statements and advertisements were misleading or deceptive. And with respect to all of the deception type of claims under the Consumer Legal Remedies Act and also under the deceptive prong under the UCL, Judge Wray declined certification of those claims, and they're not subject to appeal here, so there's really nothing to be talking about in that regard. On the other hand are the disclosure theory, the disclosure claims. The disclosure claim comes into play under the unfairness prong of the UCL, which Judge Wray certified. It also comes into play under the FCA and derivatively or parasitically under the Declaratory Judgment Act claim. So I think it's important to make that distinction between those two types of claims. Stay with us, if you would, on the Consumer Legal Remedies. What I think I heard you just say is that that's based on the unconstitutable class action waiver. Is that the exclusive basis? Is that the exclusive basis of the appeal? Yes. Yes, that's the defendant's appeal. They are challenging Judge Wray's ruling on that issue, yes. And in terms of what you have left, isn't that the class which is surviving at this time? With respect to the CLRA claim, yes. With respect to the unfair competition law claim, Judge Wray certified a class on both the unfairness prong relating directly to the overcharges that Mr. Lozano incurred in connection with out-of-cycle billing, and he also certified the UCLA claim under the unlawful prong, which is based on the fact that the defendant's violated the CLRA. So in that sense, it's derivative of the violation of the CLRA. I guess what's troubling me, and it sounds like it's troubling Judge Callahan also, is that the unfairness prong appears to be based on a false or misleading advertisement. No. The unfairness claim, which Judge Wray clearly delineated in his ruling, and that's why he certified the class, is because he found that the unfairness claim, correctly so, was based upon the plaintiff's theory that the disclosures were inadequate. It has nothing to do with any of the advertising that took place with respect to the plans. It's just looking at the disclosures and what they say, and are they adequate or are they inadequate. That's the issue on the unfairness prong. That's why Judge Wray certified under the unfairness prong, but did not certify under the deceptive prong, because under the deceptive prong, the test is whether or not a consumer is likely to be deceived. And you'll concede that that's fatal to your class action? What I will concede is that Judge Wray ruled that that claim could not be certified because it was a deception claim that involved, in his view, multiple, you'd have to look at individual plaintiffs' understanding of advertising and so forth and so on. That's not, I don't agree with that decision, but it's not part of the appeal. It's not a novel issue that could be brought up before the Ninth Circuit. Well, then let's go back to your CLRA claim. Yes. How would you define the class in that? It's the same as the class as defined. In other words, it's going to be any person who entered into a contract with AT&T Wireless, a one-rate type of plan, which includes the plans that Mr. Lozano was on, and were subjected to out-of-cycle billing. It could, I guess theoretically, if we were to redefine the class again all over again, we could go much broader, because you wouldn't necessarily have to be subject to out-of-cycle billing in order to be subjected to the unconscionable arbitration provision, but that's Mr. Lozano's hook for standing. He was subjected to out-of-cycle billing, and he was damaged by it, as the district court found below. It seems to me that you could go the opposite direction and define your CLRA class as people who sought a class action, but were precluded from doing so by the waiver. That's one way that it could be defined, if we get back down to the district court below and have a chance to make a motion for a move to certify a different class in light of the rulings. But right now, I'm kind of stuck with the record that I have and the class definition that I proposed and the class definition that Judge Ray approved, which is other than what you're suggesting. I don't disagree with you. I just don't think that that can be done in the Court of Appeal, that the Court of Appeal can redefine the class for purposes of the CLRA claim. But I would like to say, very quickly, a couple minutes on the CLRA issue, because I know the Court did ask us. I don't need you to talk about Meyer. That's exactly what I was going to say. Now we're into my time. The questions that I had, and you can kind of put them together, how does the Meyer case affect his standing, and doesn't Meyer destroy Lozano's typicality with the California subclass on CRLA claim based on the unconscionable contract terms? First, with respect to Meyer, I think that case has no impact at all on the certification of the unfairness prong under the UCL, because district court has established that Mr. Lozano was in fact damaged, and he was damaged two different ways. So I don't think the Meyer decision has any impact on the certification of the unfairness claim under the UCL. The real question is whether or not it has an impact on the certification of the claim under the CLRA and the UCL relating to the unconscionable contract provision. And I think there's two important points that need to be realized about the Meyer case. First, it was decided on demur, and I'll explain in a second the significance of that. But second, in the Meyer case, the arbitration clause was never asserted against the plaintiffs, it was never enforced against the plaintiffs, and it was never attempted to be enforced against the plaintiffs. And that's such an important point that the Court of Appeal made it three different times in its opinion, once on page one, twice on page five. So as a result, with that type of record, where it had never been enforced, never attempted to be enforced, the Court of Appeal could find under a demur standard that there was no possibility that damages could be alleged. And therefore, the Court of Appeal could find on a demur that that claim cannot be pursued, because there's not going to be any possibility of damages or standing. In Lozano, we've got a different situation. We have an arbitration clause that was, in fact, asserted, in fact, enforced against Mr. Lozano. It was enforced at the district court. It was enforced or attempted to be enforced by pursuing an appeal. For six years, basically, it was attempted to be enforced against Mr. Lozano. At times, successfully, when the district court initially said, you're off to arbitration. At times, unsuccessfully, when the district court later said, I'm vacating my decision. But the point is that it was enforced against him, and because of that, he incurred attorney's fees and costs in going through court of appeals decisions, not decisions, court of appeals proceedings, briefs, his attorneys, so forth and so on. So it's a different situation than in Meyer, where there was no attempt to enforce it. Here, it was enforced. Here, he did incur fees, expenses, damages. Okay. Unless any of my colleagues have questions, I'm going to ask you to wrap it up in a minute. All right. The only other thing I would like to say is that just turning back real briefly to the Coeur d'Alene decision, I think that even if this court finds that the district court was correct to conclude that Coeur d'Alene does not preclude arbitration of FCA claims, I think that this court can still find that the district court erred by making the assumption that the defendants would be moving to compel arbitration in 49 states. I think that was premature. The court also criticized plaintiffs for not having a management plan to deal with that possibility, but the fact is that is really putting the cart before the horse because you can't have a management plan until you know what it is you're going to have to manage. For the reasons I stated before, it's anybody's guess whether defendants would move to compel arbitration in one state or 40 states or five states. It could very well be that the plaintiffs would not oppose motions to compel arbitration in certain of the states because due to severability issues, we'd end up with a class arbitration, which would be great for the plaintiffs. So I think the court was both wrong to make that determination that the defendants necessarily would be moving to compel arbitration and also wrong to criticize the plaintiffs for not having a management plan for something that we need to know what's going to be managed first. All of that could be dealt with post-certification, and certainly at that point in time, if it turns out that defendants are moving to compel arbitration in 49 states and the judge is going to have to determine law in 49 different states, then the court always has the inherent power to revisit class certification. That's what should have been done in this case. Thank you very much. I wanted to cover a few points in response to Mr. Janiak. First of all, he stated several times that the district court was drawing a distinction between situations where there was disclosure issues or deception issues versus unfairness issues, and I invite the court to go back to read the district court's decision because I don't believe that distinction existed. Instead, what the district court talked about was the difference between the situation where you have disclosures are made, they're claimed to be inadequate, versus a situation where there's omissions altogether, the disclosure was never made. It pointed out the Caro case and said, Caro is the orange juice case, where it says fresh on the front of the orange juice and it says on the side of the orange it's from concentrate. The court, the district court correctly, pointed out that this situation where all the disclosures are there, it's just a question of how people responded and relied on them and said there's no commonality in that situation. Since that time, other courts have also picked up on that same distinction and same understanding of Caro, including those that have come since Prop 64 and have applied to UCL. Among the cases I point out to the court would be Garton v. S&M New Tech. I'm sorry. The cases that I was referring to, Your Honor, were Garton v. S&M New Tech and Laster v. T-Mobile. There's some other points I wanted to make as well. The CLRA class that Judge Robart had asked about, bear in mind that the CLRA class only goes to the arbitration clause theory and I have to underscore it's not in the complaint anywhere. You talked about how you would actually define that class and, in fact, if you were properly going to sue on something like that, you would expect to see a definition of individuals who had sought to enforce their rights through a judicial proceeding and had been compelled to go to arbitration instead. That's not the class here. And as we pointed out in the briefing, if you go back to read the actual complaint, there never was a claim, an allegation of any kind that the arbitration clause unconscionability or alleged unconscionability should be certified for a class. That only came up in briefing well after the argument on the class certification. Finally, about Meyer, which Judge Callahan, you had asked about, the only distinction that plaintiffs have offered about Meyer is that here we sought to enforce the arbitration clause, whereas in the Meyer case it had not been enforced. May I wrap up? Take a couple minutes, yeah. We want to hear what you have to say on that. In fact, the crux of the matter is really whether the clause was enforced or not. If the rule was what plaintiffs are suggesting, then defendants would be precluded essentially from trying to enforce the agreement, and that enforcement then is denied, the district court holds against you, then a CLRA clause of action for damages that can be certified on a class basis springs to life. The question is really did anybody suffer injury? And that's Prop 64. Was there injury in fact and was there a loss of money or property as a result of the alleged violation? And in this circumstance, there was not. So long as the arbitration clause was not enforced against anyone, we have a class defined with no members, and Mr. Lozano standing as a non-injured plaintiff attempting to represent that class with no members. Prop 64 makes clear that this case should be dismissed for lack of standing. I commend to the Court that Learbo's decision would suggest that that is the proper result at this point. Standing is the basis of any claim, including class claims, and therefore this case should be dismissed. Any further questions? Thank you both for your argument. This matter will stand submitted. Court is now in recess until tomorrow morning at 9 o'clock.
judges: Hall, Callahan, Robart